# IN THE UNITED STATES
# COURT OF FEDERAL CLAIMS

| | |
|---|---|
| STATE OF OHIO,<br><br>                Plaintiff,<br><br>v.<br><br>UNITED STATES,<br><br>                Defendant. | No. _____ 20-288 C<br><br>Hon. _____ |

**Complaint**

This is a suit for breach of a written contract between the State of Ohio, represented by the Ohio Department of Natural Resources, and the federal government, represented by the U.S. Army Corps of Engineers ("the Corps"). The Corps agreed to add water storage and supply to the Caesar Creek Project, a flood-control project located along the Little Miami River in Ohio. In exchange, the State of Ohio agreed to pay a percentage of project investment costs allocated to water supply, as well as 12.7% of joint-use operation and maintenance costs.

But in 2017, after Ohio's congressional delegation inquired about rising operation and maintenance costs at the Caesar Creek Project, the Corps provided for the first time an itemized list of charges it had assessed to operation and maintenance for 2015–2016. That list shows costs charged to the State of Ohio that were not for operation and maintenance of the flood control and water supply project, and so are not authorized by the parties' 1970 water supply contract.

By charging the State of Ohio more than is authorized by the water supply contract, the Corps breached the contract, and the federal government owes the State of Ohio damages for that breach.

**Jurisdiction**

1.  This Court has jurisdiction over this case under the Tucker Act, 28 U.S.C. § 1491, as a "claim against the United States founded either upon the Constitution . . . or upon any express or implied contract with the United States . . . ."

**Parties**

2.  Plaintiff, the State of Ohio, is a party to Contract No. DACW27-69-C-0089 (Jan. 15, 1970) ("the Water Supply Contract") (attached as Exhibit 1, and fully incorporated herein), with the United States, represented by the United States Army Corps of Engineers.

3.  Defendant the United States of America, through the United States Army Corps of Engineers, designed, built, and operates the dam and reservoir at Caesar Creek.

**Factual background**

   **The Flood Control Act of 1938**

4.  In the wake of the disastrous Ohio River Flood of 1937, the House Committee on Flood Control adopted a resolution "calling upon the Chief of Engineers [of the Army] to review in the light of the flood of 1937 reports previously submitted on the Ohio River and its tributaries . . . and to submit plans for protective works to prevent recurrence of the 1937 and previous record floods . . . ." In response, the Army Corps of Engineers submitted a "a comprehensive flood-control plan for the Ohio and the lower

Mississippi rivers . . . published as House Flood Control Committee Document No. 1, Seventy-fifth Congress, first session . . . ." H. Rep. No. 75-2353, at 3 (1938) (attached as Exhibit 2); *see also id.* at 9–24 (1938).

5.  That flood control report served as the technical basis for the Flood Control Act of 1938, 75 Pub. L. 761, 52 Stat. 1215 (1938), and identified Caesar Creek, on the Little Miami River in Ohio, as a future site of one of several dozen "[f]lood-control reservoirs for the Ohio River Basin[.]" Exhibit 2, H. Rep. No. 75-2353, at 11 (1938).

6.  By approving this report, Congress approved the Caesar Creek Project with the Flood Control Act of 1938.

**The Water Supply Act of 1958 and the amendments of 1963**

7.  The Water Supply Act of 1958, Pub. L. 85-500, Title III (codified, as amended, at 43 U.S.C. §§ 390b) stated that "[it] is hereby declared to be the policy of the Congress to recognize the primary responsibilities of the States . . . in developing water supplies for domestic, municipal, industrial, and other purposes, and that the federal Government should participate and cooperate with States . . . in developing such water supplies in connection with the construction, maintenance, and operation of Federal navigation, flood control, irrigation or multiple purpose projects." Pub. L. 85-500, Title III, Sec. 301(a) (codified at 43 U.S.C. § 390b(a)).

8.  As part of that policy of federal participation and cooperation with the States, the Water Supply Act of 1958 also authorized the Corps to include water storage for municipal and industrial water supply in any reservoir project by the Corps. Pub. L. 85-500, Title III, Sec. 301(a) (codified at 43 U.S.C. § 390b(b)).

9. To protect local interests' rights to water supply and storage, Congress amended the Water Supply Act in 1963. *See* H. Rep. No. 88-619, at 2 (1963) (attached as Exhibit 3). The amendments were prompted by Congress's observation that although local interests had contracted for water storage space at federal dams and reservoirs, and agreed to pay for that storage space under those contracts, "no law defines the duration of their interest in such storage space . . . ." Pub. L. 88-140, Sec. 1 (codified at 43 U.S.C. § 390c). The 1963 Amendments plugged that gap, making the rights acquired by the local interests "available to the local interest so long as the space designated for the purpose may be physically available . . . ." *Id.* (codified at 43 U.S.C. § 390e).

10. This right to water storage space, however, was not free. In the 1963 Amendments, Congress made that right "subject to performance of [the local interest's] obligations prescribed in such . . . agreement executed in reference thereto." *Id.* at Sec. 3 (codified at 43 U.S.C. § 390e).

11. In a letter supporting the legislation, the Army explained that it "favors [the] legislation, subject to clarifying amendments to permit assessment beyond the payout period of annual operation and maintenance costs allocated to water supply . . . ." Exhibit 3, H. Rep. No. 88-619, at 5. The Army-proposed language ultimately became the law, conditioning the local interests' water storage rights on payments for operation and maintenance costs allocated to water supply: "Such obligations will include continued payment of annual operation and maintenance costs allocated to water supply." Pub. L. 88-140, Sec. 3 (codified at 43 U.S.C. § 390e); Exhibit 3, H. Rep. No. 88-619, at 5.

**The Caesar Creek Project and the 1970 Water Supply Contract**

12. Against this backdrop, and with the Caesar Creek Project still slated for construction, the State of Ohio asked for the Corps' plans to be expanded, to include not just flood control but also water storage. At the State of Ohio's request, a water supply allocation with a safe yield of 37 million gallons a day was added. This expanded flood control and water supply project was envisioned as a regional water source to supply the needs of Clinton and Warren counties, including the City of Wilmington, Ohio.

13. In 1970, the federal government, represented by the Corps, entered into the Water Supply Contract with Ohio, represented by the Department of Natural Resources, in order to define the flood control and water supply project and set cost-sharing for flood control and water supply.

14. The Water Supply Contract was drafted by the Corps.

15. The Water Supply Contract's recitals note that the Caesar Creek Project was authorized by the Flood Control Act of 1938, and define the project as the water supply and flood control reservoir authorized by the Flood Control Act of 1938: "WHEREAS, construction of the Caesar Creek Reservoir on Caesar Creek, a tributary of the Little Miami River, Ohio (hereinafter called the 'Project') was authorized by the Flood Control Act approved 28 June 1938 (Public Law 761, 75th Congress, 3rd Session) . . . ." Exhibit 1 at 1.

16. The Water Supply Contract's Recitals also explain that the State of Ohio was entering into the Water Supply Contract to obtain water storage, subject to repayment under the Water Supply Act of 1958, as amended: "WHEREAS, the State desires to contract with the United States for the inclusion in the project of storage for municipal and industrial

5

water supply, and for payment of the cost thereof in accordance with the provisions of the Water Supply Act of 1958, as amended (43 U.S.C. 390b-f)." Exhibit 1 at 1.

17. Under the Water Supply Contract, the State of Ohio gained "the right . . . to utilize an undivided 48.7 percent of the storage space in the Project between elevations 800.0 and 846.0 feet above mean sea level as deemed necessary by the State to impound water for municipal and industrial use and to make withdrawals therefrom at any time . . . ." Exhibit 1, Article 1. That storage space was "estimated to be 80,400 acre-feet."[1]

18. In return, the State of Ohio agreed to pay back a percentage of the water supply and flood control project construction and investments costs over 50 years, including 3.253% interest on the unpaid balance.

19. In addition to the construction and investment costs, the State of Ohio agreed to pay "12.7 percent of the annual experienced joint-use operation and maintenance costs of the Project." Exhibit 1, Article 5, Section (c)(1).

20. The first payment for these costs was due "within 30 days from the date the State first uses the storage space for water supply purposes, and will be for the period beginning on the date the State first uses the storage space for water supply purposes and ending on June 30th following said date." Exhibit 1, Article 5, Section (c)(2). After that, "[a]nnual payments will be due and payable in advance on the 1st day of July thereafter," adjusted "to reflect the difference between the prior payment for operation and maintenance and the actual experienced joint-use costs of operation and maintenance for

---

[1] An acre-foot is the amount of water it takes to cover one acre with one foot of water, or 325,851 gallons.

6

the prior years." *Id.*

21.     The contract also provided that "[t]he extent of operation and maintenance of the Project shall be determined by the Contracting Officer [the Corps], and all records and accounting shall be maintained by the Contracting Officer. Records of the cost of operation and maintenance of the Project shall be available for inspection and examination by the State." Exhibit 1, Article 5, Section (c)(3).

22.     These joint-use operation and maintenance costs for the water supply and flood control project have been charged annually to the State of Ohio beginning in 1994, when the Caesar Creek Project began supplying water. The Corps makes those charges by invoicing the State of Ohio; an example invoice is attached as Exhibit 4. These invoices do not include any itemized breakdown of the costs that the Corps is passing on to the State of Ohio.

**The dispute over operation and maintenance costs**

23.     In 1990, the State of Ohio and the nearby City of Wilmington contracted for the State of Ohio to supply raw water from the Caesar Creek Project "subject to all the provisions set forth" in the Water Supply Contract. The City of Wilmington was allowed to withdraw up to 7 MGD from the Caesar Creek Reservoir in exchange for paying a set rate for the water. In 2004, the State of Ohio and the City of Wilmington amended that contract, with the City of Wilmington agreeing to also reimburse the State for all operation and maintenance costs charged to the State under the Water Supply Contract.

24.     In 2017, at the City's urging, U.S. Senator Sherrod Brown and U.S. Representative Steve Stivers inquired to the Corps about escalating operating and

maintenance charges at Caesar Creek.

25. The Corps responded to Senator Brown on August 2, 2017, writing that "[i]n furtherance of addressing the concerns raised, we conducted an internal audit of both the billing process and the last 10 years of billing for Caesar Creek Lake. Our records showed overcharges and undercharges over the past decade for joint-use costs, with a balance of $187,150.07 owed by the State of Ohio. The bill for this balance will be sent August 7, 2017." (A copy of that letter is attached as Exhibit 5.)

26. The Corps responded to Representative Stivers on September 15, 2017, by sending "a detailed, itemized list of the joint-cost expenditures at Caesar Creek Lake, OH." In contrast to what the Corps had told Senator Brown, the two-page "Detail" that accompanied the list stated that a "systemic error was discovered" "[d]uring a regular audit of billing for this lake which took place in June 2017 . . . ."

27. That itemized list was the first time the Corps had provided an itemized record of the operation and maintenance costs. The list was incomplete and only covered a single year's operations, 2015–2016. The letter and itemized list are attached as Exhibit 6.

28. On June 26, 2018, in response to the State of Ohio's request for an itemized list of operation and maintenance costs since 2008, the Corps provided cost details and reports displaying what it claimed were joint costs and recreation costs for each bill since 2008.

29. The itemized reports revealed that the Corps had charged the State for numerous expenses that were not operation and maintenance costs for water supply.

30. Among the facially improper line items were charges for the Corps' Visitor's

Center, constructed in 1980 and substantially remodeled in 2011, and numerous other items unrelated to operation and maintenance for the flood control and water supply project, including but not limited to birdseed, parking lots, pedestrian bridges, environmental management, water quality testing, travel orders, tree removal, and community outreach. For example, the line items include:

    a. Cincinnati travel, sports, and boat show – $1,792.00

    b. American flag set for learning center – $172.60

    c. Washer and dryer – $1,438.00

    d. Mileage and rental G71-0053k GSA Vehicle FY15 CCL – $1,847.29

    e. Repairs to solar system – $27,565.00 and $22,403.68

31. Many other expense items lacked sufficient detail to determine whether they relate to operation and maintenance for the flood control and water supply project, or if the billed item or service was specific to Caesar Creek. For example, the line items included charges for labor, with no explanation of the work done, which employee was doing it, or how the work relates to operation and maintenance of the Caesar Creek Project.

32. The Corps demanded the State pay 12.7% of all the costs identified in the 2018 and 2019 itemizations, as well as the $187,000 the Corps asserted it should have charged—but did not bill—over the past decade.[2]

33. The State of Ohio notified the Corps that it disputed its obligation to pay

---

[2] The City of Wilmington paid the State of Ohio for approximately half of the costs assessed to the State in the 2018 and 2019 bills, and refused to pay the State of Ohio any of the $187,000 assessed under the Corps' 10-year lookback.

9

many of the line-item charges and objected to the $187,000 retroactive assessment in its entirety. Faced, however, with the federal government's threat to refer any unpaid amounts to the federal Treasury Offset Program, which would effectively garnish federal-government payments to the State of Ohio in satisfaction of the unpaid amounts, the State of Ohio submitted these payments to the Corps under protest.

### The dispute over the Corps' interest charges

34. In addition to improper charges that the Corps asserts are due as operation and maintenance costs, the Corps is also unlawfully charging 1% interest on unpaid amounts it claims are due under the Water Supply Contract, plus another 6% interest for any amount the Corps claims is more than 90 days delinquent.

35. Although the Water Supply Contract authorizes interest on unpaid project investment costs allocated to flood control and water supply, the contract does not authorize interest on unpaid operation and maintenance costs.

36. In response to the State's inquiries, the Corps has asserted it may charge interest under the Debt Collection Act of 1982. But the section of that law authorizing interest charges "does not apply . . . to a claim under a contract executed before October 25, 1982, that is in effect on October 25, 1982," the effective date of the statute. 31 U.S.C. § 3717(g)(2).

### First Cause of Action
### Breach of Contract – Unauthorized Operation and Maintenance Charges

37. The State of Ohio realleges all the allegations set forth in the previous paragraphs.

38. The State of Ohio has performed all obligations required of the State by the Water Supply Contract.

39. The United States has charged—and continues to charge—the State of Ohio for costs not authorized by the Water Supply Contract. These charges constitute a breach of the contract for which the State of Ohio is entitled to damages.

## Second Cause of Action
## Breach of Contract – Lump-Sum Late Billing

40. The State of Ohio realleges all the allegations set forth in the previous paragraphs.

41. Article 5, Section (c)(2) of the Water Supply Contract sets forth the billing procedure for operation and maintenance charges due under that contract.

42. The United States' 2017 charge of $187,150.07 to the State of Ohio was not authorized by the Water Supply Contract. That charge constitutes a breach of the contract for which the State of Ohio is entitled to damages.

## Third Cause of Action
## Breach of Contract – Unauthorized Interest Charges

43. The State of Ohio realleges all the allegations set forth in the previous paragraphs.

44. The United States has charged—and continues to charge—the State of Ohio interest on payments that the Corps asserts are past due or delinquent. These charges are not authorized by the Contract or other federal law, and constitute a breach of the contract for which the State of Ohio is entitled to damages.

## Fourth Cause of Action
## Breach of the Covenant of Good Faith and Fair Dealing

45. The State of Ohio realleges all the allegations set forth in the previous paragraphs.

46. The Water Supply Contract between the State of Ohio and the United States contains an implied covenant of good faith and fair dealing. This covenant requires the United States to reasonably and in good faith perform its duties under the Water Supply Contract, and to refrain from actions that are detrimental to the State of Ohio's contractual rights.

47. The United States has breached this covenant by charging the State of Ohio for costs not authorized by the Water Supply Contract. The State of Ohio is entitled to damages for this breach.

## Fifth Cause of Action
## Declaratory Relief

48. The State of Ohio realleges all the allegations set forth in the previous paragraphs.

49. The State of Ohio seeks a declaration that under the Water Supply Contract the Corps may not charge the State of Ohio for charges not authorized by the Water Supply Contract.

50. The State of Ohio seeks a declaration that under the Water Supply Contract, the Corps may only charge for expenses necessary to operate the flood control and water storage project, or relieve any injurious effect of that project.

### Sixth (Alternative) Cause of Action
### Just Compensation Clause

51. The State of Ohio realleges all the allegations set forth in paragraphs 1–36.

52. In the alternative to the State of Ohio's other Causes of Action, the United States has taken the State's monetary property by requiring the State pay for charges other than the charges the State agreed to pay under the Water Supply Contract, without paying just compensation, in violation of U.S. CONST. Amend. V.

### Seventh (Alternative) Cause of Action
### Due Process Clause – Illegal Exaction

53. The State of Ohio realleges all the allegations set forth in paragraphs 1–36.

54. In the alternative to the State of Ohio's other Causes of Action, the United States has illegally exacted some of the charges which the Corps has assessed, conditioning the State's right to water storage under 43 U.S.C. § 390e on charges for which there is no legal authority, in violation of U.S. CONST. Amend. V.

### Prayer for Relief

The State of Ohio prays for relief as follows:

1. A money judgment in an amount as yet unascertained, according to proof at trial, but estimated to be in excess of $10,000;

2. A declaration of the State's payment obligations under Article 5, Section (c) of the Water Supply Contract;

3. The State of Ohio's costs incurred in this action, including expert witness fees, attorneys' fees, and prejudgment and post-judgment interest, as provided by law, including the Equal Access to Justice Act, 28 U.S.C. § 2412; and,

4. Any other relief as this Court may deem just.

                Respectfully submitted,

                DAVE YOST
                Ohio Attorney General

                _s/ Ian F. Gaunt_
                Ian F. Gaunt
                Assistant Attorney General
                Environmental Enforcement Section
                30 E. Broad St., 25th Floor
                Columbus, OH 43215
                (614) 466-2766
                Ian.Gaunt@OhioAttorneyGeneral.gov

                *Counsel for Plaintiff the State of Ohio*